UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Marcus Allen Wayne Hallmark,

                    Petitioner,                    Court File No. 20-cv-1080 (WMW/LIB)

    v.

                                              **REPORT AND RECOMMENDATION**

Guy Bosch,

                    Respondent.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general referral in accordance with the provisions of 28 U.S.C. § 636(b) and Local Rule 72.1, and upon Petitioner Marcus Allen Wayne Hallmark's Petition for Writ of Habeas Corpus, [Docket No. 1].

For the reasons discussed herein, the Court recommends that the Petition for Writ of Habeas Corpus, [Docket No. 1], be **DENIED** and that this action be **DISMISSED with prejudice.**

## I.    BACKGROUND AND UNDERLYING STATE COURT PROCEEDINGS

On May 4, 2020, Petitioner, a Minnesota state correctional facility inmate, filed with this Court a petition under 28 U.S.C. § 2254 for writ of habeas corpus by a person in state custody challenging the constitutionality of various aspects of his underlying court proceedings. (See, Pet. [Docket No. 1]).

The Minnesota Supreme Court has reported the following details about the events underlying Petitioner's criminal charges, as well as, his trial and convictions:

> Late in the evening on March 3, 2017, Russ was shot and killed at a Metro Transit park-and-ride facility in Minnetonka. He was shot twice—once in the back of his head and once in the forehead from between a half inch and 2 feet away—and died at the scene.

In the days before the shooting, Hallmark's mother, A.M., loaned Hallmark her vehicle to use while she was at the hospital assisting her daughter. Because one of the tires on the vehicle went flat, Hallmark left it at the Minnetonka park-and-ride on March 2. The next evening, March 3, A.M. left the hospital and returned home where she learned about the flat tire and the location of her vehicle. Because her sister drove the same type of vehicle and had the same spare tire, A.M. borrowed her sister's vehicle to go fix the flat tire. A.M.'s sister, Hallmark, and Russ (the boyfriend of A.M.'s daughter) went along to help. No fights or disputes occurred on the drive to the park-and-ride.

A.M.'s sister drove her vehicle to the park-and-ride and parked a few spots away from A.M.'s vehicle inside the facility. A.M. did not see anyone else around at that time. A.M.'s sister, Hallmark, and Russ then left the vehicle and removed the spare tire from the trunk of A.M.'s sister's vehicle. A.M.'s sister then got back into the vehicle with A.M. Hallmark and Russ went over to A.M.'s vehicle to begin fixing the flat tire. According to A.M., Russ was doing most of the work fixing the tire, but Hallmark was helping by handing him tools. At no point were there any apparent issues or disputes between Hallmark and Russ.

After Hallmark and Russ began changing the tire, A.M. testified that she heard a "loud noise" that caused her to look over at the tire-changing process. She saw Russ lying on the ground with Hallmark crouched down between the two vehicles. Hallmark later ran from the scene.

A.M. and her sister left the park-and-ride and drove to nearby Ridgedale Mall. A.M. called 911. When asked by the 911 operator what happened at the park-and-ride, A.M. answered "My son shot 'em . . . [a]nd he ran." Also during the 911 call she stated that "my son, and my sister came up to get my . . . car-to fix a flat tire. My son . . . pulled out a [expletive] gun and shot this [expletive] guy that . . . we know . . . . His name is . . . [Russ] . . . Oh my [expletive] God, I can't believe my son shot 'em." Additionally, A.M. was heard speaking to some other individual near her during the 911 call. She said, "Yes, officer, my son shot somebody and ran. Some guy in the Transit Center down there."

Later, after police had arrived and escorted A.M. and her sister to the Minnetonka police station, A.M. gave a recorded statement to the police. She confirmed that while Hallmark and Russ were working on her vehicle at the park-and-ride, she "heard like this big loud noise like a boom or a pop or something and [she] thought the car or the jack fell on [Russ]." A.M. told police that, after hearing the noise, she looked over at Russ, who was lying on the ground on his back twitching. She stated:

> And then all [of a] sudden Mark [Hallmark] just looked at me and gave me this look and I don't know that look, I've never seen that straight no smile no nothing, just these eyes just lookin' at me, not helping this man, laying there on the ground I didn't, kind of in a way I was scared you know because it's like why wouldn't my son help this guy . . . then all of a sudden he, he shot him in [the] head right in the middle of the head while he was laying on his back.

2

A.M. described the second shot in detail. She said that Hallmark "bent down" and "put it . . . right at his forehead . . . just right up in the middle of the forehead and then he pulled the trigger, and that's when I knew, that's when I [saw] the black gun, that's when I knew what was going on . . . ." At the conclusion of her recorded statement, the police asked A.M. whether there was anything important that she had left out of her statement and whether the police had made any promises or threats to her in connection with giving her statement. She responded that she had told them everything and that they had not made any threats or promises to her regarding her statement. She also answered affirmatively when asked if everything she said was true, restated "to the best of [her] recollection." She was given the opportunity to read and sign the statement and fix any errors.

A.M.'s trial testimony differed from the 911 call and her recorded statement. A.M. testified that she heard only one gunshot, which she initially thought was a problem with the car, and that she did not see a gun. She testified: "I just know [Hallmark] was c[r]ouched down . . . I never heard, like I said, a second gunshot. I only heard one." When asked whether she recalled saying that she saw Hallmark place a black gun right in the middle of Russ's forehead and pull the trigger, A.M. responded by saying, "I don't recall saying that. I mean, no." Furthermore, during cross-examination by the defense, A.M. testified that she did not see who shot Russ, she was unsure of what the "loud noise" was, she did not know there were two shots, she "never saw a gun," and she "never saw [Hallmark] shoot a gun." She also testified that she was "assuming" when she told the 911 operator what happened because "everything was happening so fast and so quick, and everyone was scared." She further testified that she was in poor condition on the night of the murder because she had been up for three days helping her daughter and was taking medication that made her "very, very drowsy." On redirect examination, the State confronted A.M. with her prior statements. She admitted making the statements, but testified that after a year of it "going over and over in [her] head" there is "a lot now that I'm able to see things and look at things straight and put everything into perspective. I didn't see no gun in my son's hand." The district court thereafter admitted A.M.'s recorded statement to police under the residual hearsay exception set forth in Minn. R. Evid. 807.

After the shooting, Hallmark fled the scene on foot. Following a coordinated effort, and with the assistance of a thermal camera affixed to a police helicopter, law enforcement located Hallmark in a marsh near the park-and-ride. Eventually, after being surrounded by police, Hallmark surrendered.

Numerous pieces of physical evidence were collected from the scene of the shooting as well as from the marsh near the park-and-ride. The morning after the shooting, police found a Ruger .380-caliber handgun as well as a small-caliber handgun holster in the marsh. While processing the scene of the shooting at the park-and-ride, police recovered two spent .380 Federal Auto ammunition cartridge cases near Russ's body. Additionally, police found an open safe in the backseat of A.M.'s vehicle. The safe contained numerous types of ammunition, including Federal Auto .380-caliber ammunition. It also contained a Macanudo cigar case, a cardboard box for a Ruger LCP handgun, along with the owner's manual, and an empty Berretta-brand gun case. A total of 13 usable fingerprints were lifted from

various locations on or in the vehicle. Police later executed a warrant for a DNA sample from Hallmark for comparison to any DNA evidence found.

The medical examiner testified at trial that Russ died from two gunshot wounds to the head. One shot entered the back of Russ's skull. The medical examiner could not determine the distance that bullet traveled. The other shot entered Russ's skull above his left eye, and, based on gunpowder burns on Russ's skin, traveled a distance from half an inch to about two feet. The medical examiner also recovered several bullet fragments from Russ's skull, which were passed on to the Hennepin County Crime Lab for further analysis.

A Hennepin County crime lab technician testified that the fingerprints found on a cigar box and a Winchester ammunition box in A.M.'s vehicle were matched to Hallmark. There were no usable prints on the recovered Ruger firearm or its magazine.

A firearms examiner also testified at trial. Her analysis focused on the two .380 Federal Auto cartridges recovered at the scene and the bullet fragments recovered from Russ's skull. She testified that both spent cartridges had been fired from the Ruger handgun recovered near the park-and-ride. The examiner also testified that at least two fragments recovered from Russ's skull had been fired by the same Ruger handgun.

A Hennepin County DNA analyst also testified. She concluded that the DNA profile obtained from the Ruger firearm "was a mixture of at least four individuals" but that "the profile of the major contributor matche[d] the DNA profile from Marcus Hallmark." The analyst noted that because four or more DNA contributors were present, she had to seek special approval from a supervisor before she could interpret the DNA profile. Special approval is issued only when there is a "clear major DNA profile present." Because Hallmark's profile was a clear major profile, the approval was given by the lab's technical leader.

A major point of contention during the trial centered on the State's intended use of evidence from a backpack which was found after the murder and indirectly connected the Ruger handgun to Hallmark. In a discussion outside the presence of the jury, the State informed the district court that the Ruger firearm and the contents of the backpack were purportedly "stolen from a police officer." The recovered backpack contained "the police officer's badge . . . [Hallmark's] identification [card], and a Ruger gunlock . . . inside a humidor . . . ." The humidor had Hallmark's fingerprints on its exterior surfaces. The State wanted to offer that evidence to link Hallmark to the Ruger firearm. The district court determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under Minnesota Rule of Evidence 403.

The jury found Hallmark guilty of both first-degree premeditated murder and second-degree intentional murder. At the sentencing hearing, the district court stated that "[Hallmark would] be sentenced only on murder in the first degree," which carries a sentence of life without the possibility of release. However, Hallmark's sentencing order shows a disposition of "convicted" for both first-degree and second-degree murder. Hallmark appealed directly to our court.

State v. Hallmark, 927 N.W.2d 281, 288–91 (Minn. 2019) (alterations in original).

Petitioner was represented by counsel throughout the state court appeal, and Petitioner's appellate counsel argued that: (1) the Minnesota state district court "abused its discretion by admitting, under Minnesota Rule of Evidence 807, the prior recorded statement of an eyewitness," Petitioner's mother A.M.; (2) the Minnesota state district court "abused its discretion by admitting, under Minnesota Rule of Evidence 403, evidence from a backpack found after Russ was murdered;" and (3) the Minnesota state district court "erred by convicting him of both first-degree and second-degree murder in violation of Minn. Stat. § 609.04 (2018)." Id. at 288. In addition to the brief filed by appellate counsel with the Minnesota Supreme Court, Petitioner filed a pro se supplemental brief, which raised "several other claims of error" and argued that his conviction should be reversed for numerous reasons. See, Id.; (see also, Appellant's Pro Se Suppl. Brief [Docket No. 16], at 2–10).

In affirming in part the state district court's decision, the Minnesota Supreme Court first considered Petitioner's argument "that the district court abused its discretion by admitting A.M.'s recorded statement to police under Minnesota Rule of Evidence 807." Hallmark, 927 N.W.2d at 291–97. After considering factors weighing for and against trustworthiness in A.M.'s statement, the Minnesota Supreme Court found that "[t]he totality of the circumstances surrounding A.M.'s statement shows that A.M.'s statement possessed sufficient circumstantial guarantees of trustworthiness." Id. at 295–97. The Minnesota Supreme Court further found that "A.M.'s statement also satisfie[d] the requirements of Rule 807." Id. at 297. Therefore, the Minnesota Supreme Court held "that the district court did not abuse its discretion by admitting A.M.'s recorded statement under Minnesota Rule of Evidence 807." Id.

The Minnesota Supreme Court then considered Petitioner's argument "that the district court erred by admitting evidence about the contents of a backpack found after Russ was

murdered." Id. at 297–99. The Minnesota Supreme Court found "that the district court did not abuse its discretion by finding that the backpack evidence was relevant." Id. at 299. The Minnesota Supreme Court then considered Petitioner's assertion the backpack's "probative value was substantially outweighed by the danger of unfair prejudice and misleading the jury" because the backpack "created an inference that [Petitioner] had committed a burglary for which he was not charged." Id. However, the Court noted that "[n]o testimony was presented at trial showing whether the handgun or the items in the backpack were stolen or simply misplaced and lost by the gun owner," "[t]he word 'burglary' was never used at trial and no witness described any details of an uncharged burglary." Id. As such, the Minnesota Supreme Court held "that the district court did not abuse its discretion by finding that the probative value of the backpack evidence connecting the handgun to [Petitioner] outweighed a speculative prejudicial effect that [Petitioner] also participated in a burglary." Id.

Next, the Minnesota Supreme Court considered Petitioner's argument "that the district court erred by entering a conviction for both first-degree and second-degree murder where second-degree murder is a lesser-included offense of first-degree murder." Id. at 299–300. The Minnesota Supreme Court noted that "[u]nder Minnesota law, a defendant may be convicted of either the crime charged or an included offense, but not both," "[A] lesser degree of the same crime" constitutes an "included offense," and "that second-degree murder is a lesser degree of first-degree murder." Id. at 300 (quotations omitted). Thus, the Minnesota Supreme Court further noted that "when a defendant is found guilty of both first-degree and second-degree murder, he may be convicted of only one or the other, but not both." Id. The Minnesota Supreme Court held that "[b]ecause [Petitioner] could not be convicted of both first-degree and second-degree murder, the district court erred by entering both convictions," and the Minnesota Supreme Court "reverse[d]

[Petitioner's] conviction for second-degree intentional murder and remand[ed] to the district court with instructions to vacate that conviction." <u>Id.</u>

Lastly, the Minnesota Supreme Court considered each of the issues raised in Petitioner's pro se brief. <u>Id.</u> at 300–08. The Minnesota Supreme Court grouped Petitioner's pro se supplemental claims "into three categories: (1) claims that the district court abused its discretion; (2) claims that his trial counsel was ineffective; and (3) claims of prosecutorial misconduct." <u>Id.</u> at 300. The Minnesota Supreme Court concluded that none of Petitioner's supplemental claims had merit. <u>Id.</u>

As relevant to the Present petition, Petitioner argued "that his sentence of life without the possibility of release was improper under Minn. Stat. § 611.02 (2018) because the district court could have sentenced him on the second-degree murder conviction." <u>Id.</u> at 306; (<u>see also</u>, Appellant's Pro Se Suppl. Brief [Docket No. 16], at 6). The Minnesota Supreme Court found that Petitioner "misstated the nature of Minn. Stat. § 611.02" which reads:

> Every defendant in a criminal action is presumed innocent until the contrary is proved . . . when an offense has been proved against the defendant, and there exists a reasonable doubt as to which of two or more degrees the defendant is guilty, the defendant shall be convicted only of the lowest.

<u>Hallmark</u>, 927 N.W.2d at 306 (alteration in original) (quoting Minn. Stat. § 611.02). The Minnesota Supreme Court then noted "that section 611.02 does not require a defendant found guilty of two crimes to be sentenced on the lesser of the two crimes," and the court found that "[t]here [wa]s sufficient evidence to support the jury's verdict that [Petitioner] committed first-degree murder beyond a reasonable doubt." <u>Id.</u> at 306–07. Therefore, the Minnesota Supreme Court concluded that Petitioner's "claim lacks merit." <u>Id.</u> at 306.

Petitioner also argued that he received ineffective assistance of counsel because, among other things, his trial counsel decided "[t]o not test [Petitioner's] clothing and hands for gunshot residue and blood." <u>Id.</u> at 307; (<u>see also</u>, Appellant's Pro Se Suppl. Brief [Docket No. 16], at 8–

9). However, the Minnesota Supreme Court found that Petitioner failed "to point to anything in the record supporting [his ineffective assistance of counsel] allegations." Hallmark, 927 N.W.2d at 307. The Minnesota Supreme Court further found, upon review of the record, that Petitioner "was not denied effective assistance of counsel." Id. Accordingly, the Minnesota Supreme Court concluded that Petitioner failed to meet the requirements for establishing an ineffective assistance of counsel claim. Id.

On May 25, 2019, the Minnesota Supreme Court issued its opinion affirming Petitioner's conviction for first-degree murder and reversing his conviction for second-degree intentional murder. Id. at 308.

## II.    HALLMARK'S PETITION FOR WRIT OF HABEAS CORPUS. [Docket No. 1].

On May 4, 2020, Petitioner filed in this Court his petition under 28 U.S.C. § 2254 for writ of habeas corpus by a person in state custody. (Pet. [Docket No. 1]). Petitioner presently asserts three grounds for granting the writ: (1) that pursuant to Minn. Stat. § 611.02, he should have received a lesser sentence because he was convicted of both first-degree murder and second-degree intentional murder; (2) that Petitioner's blood/DNA was taken without a warrant or Petitioner's consent; and (3) Petitioner was given a gunshot residue or GSR test when he was apprehended, but neither the Minnesota district court, the prosecutor, nor his appointed trial counsel had the GSR test sent to a lab to be analyzed. (Id.).

## III.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes a one-year statute of limitations for all § 2254 habeas actions. 28 U.S.C. 2244(d)(1). The one-year period begins on the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review
> or the expiration of the time for seeking such review;

8

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Id.

If a habeas petition is timely filed, then "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The AEDPA establishes that federal courts are to engage in a "limited and deferential review of underlying state court decisions." Mark v. Ault, 498 F.3d 775, 782–83 (8th Cir. 2007). Moreover, a federal court may not grant relief to a petitioner with respect to any claim that was adjudicated on the merits in state court unless the state court's decision:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Federal courts consider a state court decision "contrary to" precedent when a state court "arrives at a conclusion opposite to that reached by the [U.S. Supreme] Court on a question of law" or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. See, Williams v. Taylor, 529 U.S. 362, 413 (2000). The phrase "clearly established Federal law" refers to the holdings, but not the dicta, of United States Supreme Court opinions released prior to the date on which the state court issued its decision. See, Bobadilla v. Carlson, 570 F.

Supp. 2d 1098, 1102–03 (D. Minn. 2008), aff'd, 575 F.3d 785 (8th Cir. 2009). An "unreasonable application" of federal law occurs when the state court identifies the correct governing legal rule but then applies it unreasonably to the petitioner's case. See, Williams, 529 U.S. at 408–09. A federal court "may not issue the writ simply because it 'concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Lyons v. Luebbers, 403 F.3d 585, 592 (8th Cir. 2005) (quoting Williams, 529 U.S. at 411). The petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

Federal district courts may not conduct de novo review of a prisoner's constitutional claims. See, Yarborough v. Alvarado, 541 U.S. 652, 665 (2004). Rather, the AEDPA imposes a highly deferential standard which demands that the state court decisions be given the benefit of the doubt. See, Renico v. Lett, 559 U.S. 766, 773 (2010). When reviewing state court decisions, a "federal court also presumes that the state court's factual determinations are correct." Lee v. Gammon, 222 F.3d 441, 442 (8th Cir. 2000). A petitioner can only rebut this presumption by "clear and convincing evidence." Id.; 28 U.S.C. § 2254(e)(1).

A federal court will not entertain a petition for a writ of habeas corpus on behalf of a state prisoner unless the prisoner has first exhausted all available state court remedies. 28 U.S.C. § 2254(b); O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); Rose v. Lundy, 455 U.S. 509 (1982). This exhaustion of state remedies requirement is based on the principles of comity and federalism; its purpose is to ensure that state courts are given the first opportunity to correct alleged federal law errors raised by state prisoners. O'Sullivan, 526 U.S. at 844; Duncan v. Henry, 513 U.S. 364,

365–66 (1995) (per curiam); <u>Lundy</u>, 455 U.S. at 518–19; <u>Smittie v. Lockhart</u>, 843 F.2d 295, 298 (8th Cir. 1988).

## IV.   ANALYSIS

As a threshold matter, the Court finds that the present Petition was filed within the one-year statute of limitations established by the AEDPA. The Minnesota Supreme Court affirmed in part and reversed in part Petitioner's conviction on May 15, 2019. Under United States Supreme Court Rule 13.1, "[a] petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk within 90 days after entry of the order denying discretionary review." Therefore, the limitations period began to run on August 13, 2019 (ninety days after judgement was entered on May 15, 2019). <u>See</u>, Sup. Ct. R. 13.1; <u>see also</u>, <u>DiMartino v. Titus</u>, 19-cv-0427 (JRT/SER), 2019 WL 2360900, at *5 n.4 (D. Minn. Apr. 17, 2019), report and recommendation adopted by 2019 WL 2357047 (D. Minn. June 4, 2019). Petitioner filed his present petition for writ of habeas corpus on May 4, 2020, within the one-year limitations period under the AEDPA. (<u>See</u>, Pet. [Docket No. 1]).

### A.  Procedurally Defaulted Claims

Respondent argues that Petitioner's claim challenging the taking of his blood/DNA asserted as Ground Two in the present Petition, was not exhausted in the Minnesota state courts, and because it may not now be brought before the Minnesota state courts, it is procedurally defaulted. (<u>See</u>, Resp. [Docket No. 15], at 11–13). Therefore, Respondent maintains that this Court should not consider Ground Two of the Petition on its merits. (<u>See</u>, <u>Id.</u>). Respondent further argues that Petitioner's claim asserted in Ground Three of the present Petition challenging the failure to

have the GSR test analyzed is procedurally defaulted to the extent it asserts that the Minnesota State District Court or the prosecutor should have had the GSR test analyzed. (Id. at 13–14).

As explained below, this Court finds that Ground Two is indeed procedurally defaulted. Moreover, this Court finds that Ground Three is also procedurally defaulted to the extent that it asserts that the Minnesota State District Court or the prosecutor should have had the GSR test analyzed.

### i.    Ground Two: Blood/DNA taken without a warrant

Petitioner asserts as Ground Two of his Present Petition, that his blood/DNA was taken without a warrant or his consent. (Pet. [Docket No. 1], at 7). This is a Fourth Amendment claim.

"A state prisoner must first exhaust state court remedies before seeking federal habeas relief. This gives the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Foster v. Fabian, No. 7-cv-4317 (JRT/JJG), 2009 WL 921063, *3 (D. Minn. March 31, 2009) (citations and quotations omitted). To satisfy the exhaustion of state court remedies requirement, a prisoner must fairly present all of his federal law claims to the highest available state court before seeking habeas corpus relief in federal court. O'Sullivan, 526 U.S. at 845; Duncan, 513 U.S. at 365–66; McCall v. Benson, 114 F.3d 754, 757 (8th Cir. 1997) ("[B]efore we may reach the merits of a habeas petition, we must first determine whether the petitioner has fairly presented his federal constitutional claims to the state court"). "A petitioner must present both the factual and legal premises of his claims to the state courts in order to exhaust the claims properly." Vang v. Roy, No. 17-cv-71 (JNE/TNL), 2017 WL 4542898, at *4 (D. Minn. Sept. 12, 2017), report and recommendation adopted by 2017 WL 4535918 (D. Minn. Oct. 10, 2017) (quoting Dansby v. Hobbs, 766 F.3d 809, 823 (8th Cir. 2014)); see also, Gray v. Netherland, 518 U.S. 152, 162–63 (1996) ("[F]or purposes of exhausting state remedies, a claim for relief in habeas

corpus must include reference to a specific federal constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief.").

Here, Petitioner neither presented the factual nor the legal basis for his claim challenging the taking of his blood/DNA asserted as Ground Two of the present Petition at any time to the Minnesota Supreme Court. See, Hallmark, 927 N.W.2d at 288; (Appellant's Pro Se Suppl. Brief [Docket No. 16], at 3–10). Indeed, Petitioner acknowledges that he did not raise this issue with the Minnesota Supreme Court. (Pet. [Docket No. 1], at 12]). Therefore, Petitioner did not "fairly present" Ground Two of the present Petition to the highest available Minnesota state court.

> If a petition contains claims that have not been fairly presented, the court must then determine if those claims are unexhausted or procedurally defaulted. A claim is unexhausted if it has not been fairly presented in one complete round of the state's established appellate review process, but the petitioner has the right, under state law, to raise the claim by any available procedure. A constitutional claim is procedurally defaulted if the state prisoner fails to exhaust his state court remedies with respect to that claim and the state courts will no longer review it because an independent and adequate state procedural rule precludes further litigation of the claim.

Foster, 2009 WL 921063, at *3 (citations omitted).

Petitioner did not, but more importantly he can no longer, fairly present his claim challenging the taking of his blood/DNA to the Minnesota Supreme Court. In State v. Knaffla, the Minnesota Supreme Court held that when an issue is or could have been litigated on direct appeal, it may not be brought in a subsequent, collateral appeal.[1] 243 N.W.2d 737 (Minn. 1976). Here, Petitioner's claim challenging the taking of his blood/DNA could have been fairly (but was not) presented in his previous petition for further review by the Minnesota Supreme Court. See,

---

[1] "There are two exceptions to the Knaffla rule: (1) if a novel legal issue is presented, or (2) if the interests of justice require review." Schleicher v. State, 718 N.W.2d 440, 447 (Minn. 2006) (quotations omitted). Neither exception is applicable in this case.

Hallmark, 927 N.W.2d at 288; (Appellant's Pro Se Suppl. Brief [Docket No. 16], at 3–10).

Therefore, it may not again be raised in any subsequent state appeal. See, Knaffla, 243 N.W.2d at

741. Accordingly, Petitioner's claim challenging the taking of his blood/DNA asserted as Ground

Two in the present Petition is procedurally defaulted. See, Id.

> If a claim is procedurally defaulted on federal habeas review, a federal court
> may hear the petition only under two limited circumstances: (1) if the petitioner can
> demonstrate cause for the procedural default and actual prejudice resulting from the
> alleged violation of federal law; or (2) if the court's failure to consider the claim
> will result in a fundamental miscarriage of justice.

Kindred v. Titus, No. 17-cv-620 (SRN/HB), 2017 WL 6987990, at *3 (D. Minn. Dec. 27, 2017)

(citing McCall v. Benson, 114 F.3d 754, 758 (9th Cir. 1997)), see, also, Coleman v. Thompson,

501 U.S. 722, 750 (1991) (setting forth circumstances under which federal habeas review of

procedurally defaulted claims is available).

> To establish cause for the default, a petitioner generally must show that
> some objective factor external to the defense impeded counsel's efforts to comply
> with the State's procedural rule. To establish prejudice, the petitioner must show
> that the errors of which he complains worked to his actual and substantial
> disadvantage, infecting his entire trial with error of constitutional dimensions. A
> court need not consider prejudice unless the petitioner demonstrates cause.

Kindred, 2017 WL 6987990, at *3 (citations and quotations omitted); accord, Coleman, 501 U.S.

at 753. To establish a fundamental miscarriage of justice, a petitioner must "show, based on new

evidence, that a constitutional violation has probably resulted in the conviction of one who is

actually innocent." Brownlow v. Groose, 66 F.3d 997, 999 (8th Cir. 1995); accord, Kindred, 2017

WL 6987990, at *3 (citing McCall, 114 F.3d at 758). "If neither exception applies, the procedural

default cannot be excused, and the court should deny the petition without reaching the merits of

the claims." Kindred, 2017 WL 6987990, at *3.

Here, Petitioner has articulated two reasons for his procedural default. (See, Pet. [Docket

No. 1], at 7, 12). First, Petitioner asserts that he did not know the name of the hospital where the

blood draw occurred. (Id. at 7, 12). Second, Petitioner asserts that this claim "was thought of at a later time." (Id. at 12). However, neither of these articulated reasons constitute cause for procedural default.[2] See, Murphy v. King, 652 F.3d 845, 850 (8th Cir. 2011) (quoting Murray v. Carrier, 477 U.S. 478, 486 (1086)) ("The basis for this claim was available to counsel, and 'the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default.'").

Since Petitioner has not satisfied the cause component required to overcome the foregoing claims' procedural default, it is unnecessary to address the prejudice component. See, Coleman, 501 U.S. at 753; Kindred, 2017 WL 6987990, at *3. Likewise, Petitioner cannot meet the "fundamental miscarriage of justice" exception because he failed to present any "reliable new evidence" providing clear and convincing proof that he is actually innocent. See, Brownlow, 66 F.3d at 999; Kindred, 2017 WL 6987990, at *3. As such, Petitioner's procedural default of his claim challenging the taking of his blood/DNA asserted as Ground Two in the present Petition cannot be overcome, and this Court is precluded from adjudicating these claims on the merits.

Therefore, the Court recommends that Ground Two of the Petition for Writ of Habeas Corpus, [Docket No. 1], be **DENIED** and that it be **dismissed with prejudice**.[3]

### ii. Ground Three: Claims One and Two—GSR Test

Petitioner asserts as Ground Three of the present Petition that he was subject to a GSR or gunshot residue test when he was apprehended, but neither the Minnesota State District Court, the

---

[2] Petitioner alleges that two policemen took him to a hospital, and they proceeded to take vials of his blood. (Pet. [Docket No. 1], at 7]). The name of the hospital where the blood draw occurred is not material to his claim. As such, not knowing the name of the hospital where the blood draw occurred could not have reasonably impeded Petitioner's efforts to comply with the state procedural rule. This is plainly demonstrated by the fact that Petitioner is now able to raise his blood-draw claim in this Court, despite still not knowing the name of the hospital where the blood draw occurred. (See, Id. at 7, 12).

[3] See, Bush v. Smith, No. 17-cv-3129 (WMW/SER), 2018 WL 542693, *1-2 (D. Minn. Jan. 24, 2018) (dismissing with prejudice habeas claims which were procedurally defaulted).

prosecutor, nor his appointed trial counsel had the GSR test sent to a lab to be analyzed. (Pet. [Docket No. 1], at 8). Thus, Ground Three raises three distinct claims. First, Petitioner claims that the State District Court did not sue sponte have the GSR test sent to a lab to be analyzed. Second, Petitioner claims that the prosecutor did not have the GSR test sent to a lab to be analyzed. Third, Petitioner claims that his appointed trial counsel did not have the GSR test sent to a lab to be analyzed. (See, Id.). Respondent argues that Petitioner's claim challenging the failure to have the GSR test analyzed asserted as Ground Three of the present Petition is procedurally defaulted to the extent it asserts that the Minnesota State District court or the prosecutor should have had the GSR test analyzed. (See, Resp. [Docket No. 15], at 13–14).

As set forth above, to satisfy the exhaustion of state court remedies requirement, a prisoner must fairly present all of his federal law claims to the highest available state court before seeking habeas corpus relief in federal court. O'Sullivan, 526 U.S. at 845; Duncan, 513 U.S. at 365–66; McCall, 114 F.3d at 757. "A petitioner must present both the factual and legal premises of his claims to the state courts in order to exhaust the claims properly." Vang, 2017 WL 4542898, at *4 (quoting Dansby, 766 F.3d at 823).

Petitioner argued to the Minnesota Supreme Court that he received ineffective assistance of counsel because, among other things, his trial counsel decided "[t]o not test [Petitioner's] clothing and hands for gunshot residue and blood." Hallmark, 927 N.W.2d at 307; (see also, Appellant's Pro Se Suppl. Brief [Docket No. 16], at 8–9). However, Petitioner did not raise any other arguments related to GSR testing. (See, Appellant's Pro Se Suppl. Brief [Docket No. 16], at 3–10). More importantly, Petitioner did not ever argue below that the state court or the prosecutor acted improperly by not having the GSR test analyzed. (See, Id.). While Petitioner arguably presented some of the factual basis for his first and second GSR test claims—that the GSR test

was not analyzed, that presentation related to his trial counsel. Petitioner clearly did not fairly present the legal premises of these claims as it now relates to the State District Court or the prosecutor at any time to the Minnesota Supreme Court. Neither the State District Court nor the prosecutor could have possibly provided Petitioner with ineffective assistance of counsel.

Therefore, Petitioner did not "fairly present" his first and second GSR test claims, asserted in Ground Three of the present Petition, to the highest available state court. Because Petitioner's claims asserted as Ground Three of the present Petition, to the extent they relate to the State District Court or the prosecutor, could have been (but were not) presented to the Minnesota Supreme Court, they may not again be raised in a subsequent state appeal. See, Knaffla, 243 N.W.2d at 741. As a result, Petitioner's first and second GSR test claims asserted in Ground Three of the present Petition are procedurally defaulted. See, Id. In addition, Petitioner has not satisfied the cause component to overcome his claims' procedural default, nor can he meet the "fundamental miscarriage of justice" exception. See, Coleman, 501 U.S. at 753; Brownlow, 66 F.3d at 999; Kindred, 2017 WL 6987990, at *3. As such, Petitioner's procedural default cannot be overcome, and this Court is unable to adjudicate these claims as well.

Accordingly, the Court recommends that Petitioner's first and second GSR test claims, concerning the State District Court and the prosecutor, asserted in Ground Three of the Petition for Writ of Habeas Corpus, [Docket No. 1], be **DENIED** and **dismissed with prejudice**.

### B.  Ground One: Lesser Sentence Pursuant to Minn. Stat. § 611.02

Petitioner asserts that pursuant to Minn. Stat. § 611.02, he should have received a lesser sentence because he was convicted of both first-degree murder and second-degree intentional murder. (Pet. [Docket No. 1], at 5). Specifically, Petitioner asserts that he was convicted of both first-degree murder and the lesser included offense of second-degree intentional murder. (Id.).

Petitioner further maintains that had he been sentenced on the lesser included offense of second-degree intentional murder, he would have received a maximum of forty years in prison, rather than, the life without the possibility of parole sentence he received because the Minnesota State District Court sentenced him on the first-degree murder conviction. (Id.). Petitioner contends that because Minn. Stat. § 611.02 required the State District Court to sentence him on the lesser included offense of second-degree intentional murder, the State District Court should have done so. (Id.). Therefore, Petitioner contends that he should either get a new trial or be sentenced on the lesser crime of second-degree intentional murder. (Id.).

Petitioner presented this same argument to the Minnesota Supreme Court below, and it found that he "misstated the nature of Minn. Stat. § 611.02" because "section 611.02 does not require a defendant found guilty of two crimes to be sentenced on the lesser of the two crimes." Hallmark, 927 N.W.2d at 306. The Minnesota Supreme Court further found that "[t]here [wa]s sufficient evidence to support the jury's verdict that [Petitioner] committed first-degree murder beyond a reasonable doubt," and thus, Petitioner's "claim [here] lacks merit." Id. at 306–07.

Federal courts grant a state prisoner habeas relief only if he is held in custody in violation of the Constitution, laws, or treaties of the Untied States. Engle v. Isaac, 456 U.S. 107 (1982); 28 U.S.C. § 2254; see also, Wainwright v. Goode, 464 U.S. 78, 83 (1983) (per curiam ) ("It is axiomatic that federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension."); Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, law or treaties of the United States."). Therefore, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle, 502 U.S. at 67; see also, Evenstad v. Carlson, 470 F.3d 777, 782 (8th Cir. 2006) (quoting Estelle, 502 U.S. at 67–68) ("Like

the district court, we lack authority to review the Minnesota state courts' interpretation and application of state law, for 'federal habeas corpus relief does not lie for errors of state law . . . .'"); Yeo v. Janssen, No. 15-2748 (MJD/JJK), 2016 WL 3960358, at *3 (D. Minn. Apr. 1, 2016), report and recommendation adopted by 2016 WL 3962853 (D. Minn. July 20, 2016) ("Claims based on state court interpretations of state law are not subject to federal habeas review.").

In the present case, Petitioner requests that this Court review a decision of the Minnesota Supreme Court regarding the application of a Minnesota state statute. (See, pet. [Docket No. 1], at 5). Petitioner fails to identify a violation of his constitutional rights or federal law. Rather, he contends that because he was improperly convicted of both first-degree murder and the lesser included offense of second-degree intentional murder, he should have been sentenced on the lesser offense pursuant to Minn. Stat. § 611.02. See, Id. Thus, as a question of state law only, Count One of the present Petition is not properly before this Court. See, Estelle, 502 U.S. at 67; Evenstad, 470 F.3d at 782; Yeo, 2016 WL 3960358, at *3.[4]

Therefore, the Court recommends that Ground One of the Petition for Writ of Habeas Corpus, [Docket No. 1], be **DENIED** and that it be **dismissed with prejudice**.

---

[4] Moreover, even if Ground One could be construed as raising a cognizable constitutional claim, it would be procedurally barred. "In order to fairly present a federal claim to the state courts, the petitioner must have referred to '"a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue" in a claim before the state courts.'" McCall v. Benson, 114 F.3d 754, 757 (8th Cir. 1997) (quoting Myre v. State of Iowa, 53 F.3d 199, 200–01 (8th Cir. 1995)); see also, Wyldes, 69 F.3d at 251 ("At a minimum, though, the petitioner during direct appeal must have explicitly referred the state courts to the United States Constitution or federal case law."). "[P]resenting a claim to the state courts that is merely similar to the federal habeas claim is insufficient to satisfy the fairly presented requirement." Abdullah v. Groose, 75 F.3d 408, 412 (8th Cir. 1996). Here, Petitioner presented his argument to the Minnesota Supreme Court solely as an issue of state law, he did not refer to any federal constitutional right, constitutional provision, federal constitutional case, or state case raising a federal constitutional issue. (See, Appellant's Pro Se Suppl. Brief [Docket No. 16], at 6). Because Petitioner could have raised any such federal constitutional issue to the Minnesota Supreme Court but did not, any such issue is now procedurally defaulted. See, Knaffla, 243 N.W.2d at 741. In addition, Petitioner has not satisfied the cause component to overcome his claims' procedural default, nor can he meet the "fundamental miscarriage of justice" exception. See, Coleman, 501 U.S. at 753; Brownlow, 66 F.3d at 999; Kindred, 2017 WL 6987990, at *3. As such, even if Ground One could be construed as raising a cognizable constitutional claim, on the present record, this Court would be unable to adjudicate it.

### C.  Ground Three: Claim Three—Ineffective Assistance of Counsel

Lastly, this Court considers the sole remaining claim under Ground Three of the present Petition, the claim that Petitioner received ineffective assistance of counsel because, although he was subject to a GSR or gunshot residue test when he was apprehended, his appointed trial counsel did not have the GSR test sent to a lab to be analyzed. (Pet. [Docket No. 1], at 8).

"The Sixth Amendment, applicable to the States by the terms of the Fourteenth Amendment, provides that the accused shall have the assistance of counsel in all criminal prosecutions. The right to counsel is the right to effective assistance of counsel." Missouri v. Frye, 566 U.S. 134, 138 (2012) (citing Strickland v. Washington, 466 U.S. 668, 686 (1984)). "To establish ineffective assistance of counsel, a petitioner must show both that (1) his counsel's performance was deficient, or that it 'fell below an objective standard of reasonableness,' and also that (2) 'the deficient performance prejudiced the defense.'" Bahtuoh v. Smith, 855 F.3d 868, 871 (8th Cir. 2017) (quoting Strickland, 466 U.S. at 687–88). "Failure to establish either Strickland prong is fatal to an ineffective-assistance claim." Worthington v. Roper, 631 F.3d 487, 498 (8th Cir. 2011).

"The first prong of Strickland requires a showing that counsel's performance fell below an objective standard of reasonableness." Id. "Establishing objective unreasonableness is particularly difficult with ineffective assistance of counsel claims. Strickland provides a deferential standard to review such claims by having courts 'apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.'" Bahtuoh, 855 F.3d at 872 (quoting Harrington v. Richter, 562 U.S. 86, 104 (2011)); accord, Lemaster v. Kelly, 750 Fed. App'x 499, 501 (8th Cir. 2018)).

The second prong of <u>Strickland</u> requires a showing of prejudice. <u>Bahtuoh</u>, 855 F.3d at 871.

"The prejudice prong of <u>Strickland</u> is only met where there is 'a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different.'"

<u>Taylor v. Kelley</u>, 825 F.3d 466, 470 (8th Cir. 2016) (quoting <u>Strickland</u>, at 694). "For there to be

a reasonable probability that the result would have been different, '[i]t is not enough "to show that

the errors had some conceivable effect on the outcome of the proceeding."'" <u>Id.</u> (quoting

<u>Harrington</u>, 562 U.S. at 104). "A reasonable probability is a probability sufficient to undermine

confidence in the outcome." <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 694).

> A federal court may grant relief under 28 U.S.C. § 2254(d)'s "unreasonable
> application" clause if a state court has unreasonably applied the governing legal
> principle to the facts of the case. The state court's decision must be "more than
> incorrect or erroneous"—it "must be objectively unreasonable." A decision is not
> objectively unreasonable if "fairminded jurists could disagree" as to its correctness.

<u>Bahtuoh</u>, 855 F.3d at 871 (citations omitted). Therefore, "[u]nder § 2254(d), 'the pivotal question

is whether the state court's application of the <u>Strickland</u> standard was unreasonable.'" <u>Taylor</u>, 825

F.3d 470 (quoting <u>Harrington</u>, 562 U.S. at 101); <u>see also</u>, <u>Bahtuoh</u>, 855 F.3d at 872 (quoting

<u>Cullen v. Pinholster</u>, 563 U.S. 170, 190 (2011)) ("Our review of the Minnesota Supreme Court's

application of Strickland's deficiency element to [the petitioner's] appeal 'is thus doubly

deferential,' requiring a 'highly deferential look at counsel's performance through the deferential

lens of § 2254(d).'").

Here, the Minnesota Supreme Court applied the <u>Strickland</u> standard, correctly noting that

"[t]o prevail on this claim, [Petitioner] must show that '(1) his counsel's representation fell below

an objective standard of reasonableness and (2) a reasonable probability that the outcome would

have been different but for counsel's errors.'" <u>Hallmark</u>, 927 N.W.2d at 307 (quoting <u>State v.</u>

<u>Manley</u>, 664 N.W.2d 275, 289 (Minn. 2003)). The Minnesota Supreme Court then concluded both

that Petitioner had failed to meet either of the requirements to establish an ineffective assistance of counsel claim because he has not pointed to anything in the record that supported his allegations and, upon review of the record, that Petitioner "was not denied effective assistance of counsel." Id.

As the Minnesota Supreme Court identified and applied the correct federal standard, the only question now remaining is whether the Minnesota Supreme Court's determination that Petitioner failed to meet his burden of establishing either that his trial counsel's performance fell below an objective standard of reasonableness or that he was prejudiced involved an unreasonable application of clearly established federal law. See, e.g., Taylor, 825 F.3d at 470; Worthington, 631 F.3d at 498.

Petitioner now argues that his trial counsel's decision not to have the GSR or gunshot residue test sent to a lab to be analyzed was objectively unreasonable because it "without a doubt would be relevant to [his] case," and "it would show if [he] shot a firearm." (Pet. [Docket No. 1], at 8).

Petitioner's trial counsel chose to emphasize the fact that the GSR test had not been analyzed by the prosecution during his closing argument, and Petitioner's trial counsel argued that there was a reasonable doubt because there was not "any scientific evidence that proves that [Petitioner] fired the gun on March 3, 2017" because law enforcement had not analyzed the GSR test. (Appendix [Docket No. 16], at 35–36). "[A]ttorneys who have prepared for trial are entitled to a 'strong presumption' that the challenged action was 'sound trial strategy.'" Lemaster, 750 Fed. App'x at 501. Here, Petitioner has not pointed to anything in the record that indicates his trial counsel's strategy regarding the lack of GSR testing was objectively unreasonable. (Pet. [Docket No. 1], at 8]).

Notably, Petitioner does not represent in his Petition that a GSR test would have shown he did not shoot a firearm, but he merely states that it would have shown if he shot a firearm. (Id.). Moreover, there was testimony during Petitioner's trial that indicated gunshot residue could be removed through washing hands or wiping hands on one's pants or in the grass. (Appendix [Docket No. 16], at 30). Petitioner does not here address that testimony. Nor does Petitioner point to anything in the record that indicates that the outcome of his trial would have been different had the GSR test been analyzed. Indeed, Petitioner does not even argue that the outcome would have been different, he merely states that analysis of the GSR test "would be relevant" to his case. (See, Pet. [Docket No. 1], at 8]).

Accordingly, the Minnesota Supreme Court' application of the Strickland standard was not unreasonable, and this Court may not grant relief under 28 U.S.C. § 2254(d).

Therefore, the Court recommends that Petitioner's third claim, ineffective assistance of counsel, asserted in Ground Three of the Petition for Writ of Habeas Corpus, [Docket No. 1], be **DENIED** and **dismissed with prejudice**.

## V.    CERTIFICATE OF APPEALABILITY

One further issue merits discussion: A habeas corpus petitioner seeking relief pursuant to § 2254 cannot appeal an adverse ruling on his petition unless he is granted a Certificate of Appealability (hereinafter "COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. Daniel, 529 U.S. 473, 484 (2000).

In this case, the Court finds that it is highly unlikely that any other court, including the Eighth Circuit Court of Appeals, would decide Petitioner's claims any differently than they have been decided here. Petitioner has not identified, and the Court cannot independently discern, anything novel, noteworthy, or worrisome about this case that warrants further appellate review. It is therefore recommended that Petitioner not be granted a COA in this matter. See, e.g., Samuelson v. Roy, No. 13-cv-3025 (PAM/LIB), 2014 WL 2480171 (D. Minn. May 28, 2014).

## VI.   CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. The Petition for a Writ of Habeas Corpus, [Docket No. 1], be **DENIED**; and

2. This action be **DISMISSED with prejudice**.

Dated: January 29, 2021                                      s/Leo I. Brisbois
                                                            Leo I. Brisbois
                                                            U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).